NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0907n.06

Nos. 10-5507/10-5633

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 16, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|    Plaintiff-Appellee/Cross-Appellant, ) | |
| ) | ON APPEAL FROM THE UNITED |
| v. ) | STATES DISTRICT COURT FOR THE |
| ) | EASTERN DISTRICT OF TENNESSEE |
| DEXTER MORRIS, Jr., ) | |
| ) | |
|    Defendant-Appellant/Cross-Appellee. ) | |
| ) | |

BEFORE: CLAY and GIBBONS, Circuit Judges; KORMAN, District Judge.[*]

**EDWARD R. KORMAN, District Judge.**

This is an appeal from a judgment, entered after a trial by jury, convicting the defendant, Dexter Morris, Jr., of two counts of depriving the constitutional rights of another in violation of 18 U.S.C. § 242, and one count of willfully making a false statement to the FBI during the course of the investigation in violation of 18 U.S.C. § 1001. The conviction arises out of the sexual abuse of two women by Morris, the then-Hamblen County Deputy Sheriff, during the routine traffic stops that led to the rape of one woman and the strip search of another. Although the charges against Morris arose out of these two discrete incidents, they were not the only ones of which the jury heard evidence. The decision to charge Morris with a violation of 18 U.S.C. § 242 and the admission into evidence of other similar acts provide the principal, although by no means the only, basis for his appeal. The

---

[*]The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

government cross-appeals the sentence. We affirm the judgment of conviction but vacate the sentence.

**BACKGROUND**

1.      *Morris's Encounter with JL (Count One)*

On the evening of August 24, 2005, JL and Dwight Manis left Manis's house in JL's pickup truck to pick up a pizza and run an errand. On their way back to Manis's house, JL and Manis were pulled over by Morris. Morris approached JL's window, took her license, registration, and insurance information, and asked her to step out of the truck. While Manis was still in the passenger seat, Morris heard the sound of beer cans rattling in the truck and asked JL if she had been drinking, to which she responded that she had not. Morris then asked JL if she had any drugs on her, which she denied, and Morris told JL to pull her bra out from her body and shake it to see if anything came out. Morris asked JL to do this five or six times and found nothing.

Morris also obtained JL's consent to search the truck. Morris first ordered Manis to stand with JL while he searched the truck and later put Manis into the backseat of the police car. Subsequently, Morris ordered Manis to walk home. During his search of JL's pickup truck, Morris found a small amount of marijuana and one half tablet of Lortab, a hydrocodone prescription pain killer. Morris told JL that she was likely going to jail for five to six years and was going to lose her job. Morris also found a souvenir corncob pipe and a shopping bag that contained a few small sex toys purchased by JL earlier in the day. In reference to the sex toys, Morris asked JL if she and Manis were going to have a good time later. At some point during the search, Morris also asked JL what she would do to avoid jail, to which JL responded that she would do "anything," though she

2

testified that she said this as a figure of speech and did not intend it to mean that she would do anything.

After one-and-a-half to two hours on the side of the road, Morris told JL that he had to respond to another call and that she should drive to a nearby church and wait for him to return. Morris said that he still had JL's license and would come after her if she left. He told her not to call anyone or use her cell phone. JL complied. After waiting at the church for approximately twenty minutes, Morris pulled up and told JL to follow him in her car. Morris drove to the end of a dead-end cul-de-sac in a nearby cemetery, and they both parked.

Morris asked JL to get out of her truck, and while leaning against his car with his arms crossed, told JL to touch his genitals. JL complied. Morris then told JL to get in the back seat of his car. With one rear door closed, Morris stood upright blocking the other door and had sex with JL. A Hamblen County Sheriff testified that the rear doors of the police cruiser could not be opened from the inside. JL testified that Morris asked her to perform oral sex and to use the small sex toy he had previously found in her car. She testified that she could "absolutely not" say no to these demands, and on cross-examination she said that Morris made her have sexual intercourse with him. JL said that she did not scream or resist Morris because she was "scared to death."

Morris then received a call on his radio, and while JL was still in the backseat, he told her not to say a word and answered the call. JL testified that the dispatcher said that they had received worried calls from JL's sister asking about JL's whereabouts. After the call, Morris put on a condom and returned to the backseat and told JL that he was not going to stop until she "got off." JL testified that she faked an orgasm and that Morris finished having sex.

3

After the sex, JL asked Morris what his name was and he responded that she did not need to know his name. Morris then returned JL's license to her and told her that she was free to go, but that if she told anybody about this in the next year, he would come back to get her. Morris also recited JL's address and told her that he knew that she and her daughter lived there. Morris left, keeping the small amount of marijuana and the corncob pipe that he confiscated from JL's car.

Once JL left the cemetery she called her sister, Wanda Albright, to tell her that she was all right but did not tell her anything about the incident. She then returned to Manis's house. The next morning, JL returned home and called her best friend, Helen Mowell, and told her what had happened the previous night. Mowell told JL to put the clothes she was wearing in a bag to keep, which JL did. Mowell testified that JL was quivery and crying on the phone and that, after hearing the story, she concluded that JL had been raped and told her so. On February 9, 2007, JL met with Federal Bureau of Investigations Special Agent Lane Rushing. JL gave the bag of clothes she was wearing the night of the Morris incident to Rushing for testing. The FBI's DNA testing revealed the presence of Morris's semen on JL's shorts.

After her encounter with Morris, JL experienced flashbacks, cried almost daily, thought about cutting her wrists, had recurring nightmares, and had to sleep with a chair propped under her door. She also testified that she lost her job after an angry outburst at her boss. Wanda Albright, JL's sister, testified that prior to the night in question, JL's demeanor was energetic and bubbly, but that after, JL was hateful, argumentative, and low-energy. Manis testified that JL has been quiet and stressed out since the night with Morris, no longer as "happy go lucky" as she used to be.

4

*2.      Morris's Encounter with NE (Count Two)*

Around two in the morning on September 18, 2005, NE was driving back to her house with her boyfriend, Adam Limpkin, and their two sons. Morris passed NE's car going in the opposite direction, turned around and pulled NE over. After taking NE's license and running her name, Morris accurately told NE that there was a warrant out for her arrest for violation of probation (NE was on probation for misdemeanor domestic assault) and that she was going to jail. One of NE's sons was not sitting in a car seat so a sheriff accompanying Morris escorted Limpkin back to his house to retrieve one. While Limpkin was away, Morris repeatedly searched NE and told her to shake her bra three or four times. Morris also told NE that she was going to be charged with child endangerment but that there was a way they could work that out. Limpkin then returned with the other sheriff, drove the children home, and NE was arrested and taken to the county jail.

After being processed, Morris took NE to an interview room. Morris told NE that she was going to be charged with child endangerment and that her children might be taken away from her unless she did what he asked. Morris then talked about NE's breasts and asked her what cup size she wore. Morris said that if she showed him her breasts, she would not be charged with child endangerment. NE then lifted up her bra.

Morris then told NE that she would not be charged with child endangerment, wrote down her address, and said that he would be paying her a visit. While NE was outside waiting for a ride home, Morris again said that he had her address and was going to pay her a visit. The friend who gave NE a ride home testified that she was quiet and upset after leaving the jail.

**DISCUSSION**

*1.    Count One: Sufficiency of the Evidence for Sentencing Enhancement*

Morris makes two arguments with respect to the sufficiency of the evidence on count one, which charges him with depriving JL of a right protected by the Fourth and Fourteenth Amendments to the Constitution of the United States in violation of 18 U.S.C. § 242.  First, he argues that he did not have notice that the rape of JL deprived her of such a constitutional right.  Second, he argues that the evidence was insufficient to satisfy the sentencing enhancement element of count one.  Specifically, count one charged Morris with violating 18 U.S.C. § 242, which provides that "[w]hoever, under color of any law . . . willfully subjects any person . . . to the deprivation of any rights . . . protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both."  Section 242, however, contains a sentencing enhancement element that, in relevant part, increases the maximum penalty to life in prison where the defendant's acts include "aggravated sexual abuse."

We address the sentencing enhancement issue first.  The sufficiency of the evidence with respect to this issue is reviewed in the same way that we review the sufficiency of the evidence with respect to the elements of a substantive offense, because both elements must be found by the jury.  *See generally Apprendi v. New Jersey*, 530 U.S. 466 (2000).  In so doing, "we assess whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001) (internal quotation marks omitted).  We also "allow the

6

government the benefit of all reasonable inferences and refrain from independently judging the weight of the evidence." *Id.*

"Because aggravated sexual abuse is not defined in § 242, the statute necessarily requires reference to 18 U.S.C. § 2241, the federal aggravated sexual abuse statute." *United States v. Holly*, 488 F.3d 1298, 1301 (10th Cir. 2007). Under that statute, one commits aggravated sexual abuse if he "knowingly causes another person to engage in a sexual act (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping." 18 U.S.C. § 2241(a).

"Force" is not defined by the statute, but exists "when the sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact . . . . [F]orce may be inferred by such facts as disparity in size between victim and assailant, or disparity in coercive power . . . . [T]he element of force . . . does not require the brute force commonly associated with rape." *Holly*, 488 F.3d at 1302 (internal quotation marks, citations, and alterations omitted). We have likewise held that the element of force is satisfied if "the sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact." *United States v. Weekley*, 130 F.3d 747, 754 (6th Cir. 1997) (internal quotation marks omitted).

This element was satisfied here. Particularly apposite is *United States v. Lucas*, 157 F.3d 998 (5th Cir. 1998), where the warden of a county jail summoned the victim "to a relatively secluded location, locked the door so that she could not escape his advances, and pressed her against a table in such a way that she could not leave." *Id.* at 1002 (footnote omitted). The Fifth Circuit held that

7

"the disparity in power between a jail warden and an inmate, combined with physical restraint, is sufficient to satisfy the force requirement of § 2241." *Id.*

Morris's conduct here was comparable. First, he used his position as a law enforcement officer to deprive JL of her freedom and separated her from Manis, who had been in the truck when Morris pulled it over. Moreover, although he left her alone temporarily at a secluded church, he kept her driver's license and threatened that he would come after her if she left or called anyone on her cell phone. When Morris returned, he ordered her to get in the backseat where JL was restrained in a small enclosed environment. The rear doors could not be opened from the inside and Morris stood upright blocking the only open door. Indeed, the back seat of a police car is used to transport arrested persons and was described as a "cage." R. 218 at 197. This provides ample support for a jury finding that the sexual assault inflicted upon JL was a direct result of her being trapped in this environment.

*United States v. Crow*, 148 F.3d 1048 (8th Cir. 1998), upon which Morris relies, is plainly distinguishable. The Eighth Circuit there reversed a finding by the district court for sentencing purposes that the defendant committed abusive sexual contact using force. *Id.* at 1051. The decision was based on the lack of evidence of the defendant's size as compared to the victim, the victim's perceived ability to escape the sexual attack, and uncertainty as to what the victim meant when she testified that the defendant had hurt her. *Id.* at 1050–51. Here, however, the jury had ample evidence to reasonably determine that JL was unable to escape the attack because of her confinement in the back seat of Morris's car and to judge Morris's size as compared to JL.

*2.      Notice Requirement*

Morris argues that 18 U.S.C. § 242 did not provide him with sufficient notice because the statute did not make it reasonably clear that his conduct violated JL's or NE's constitutional rights. Conviction under 18 U.S.C. § 242 requires, among other things, proof that the defendant deprived the victim of a right secured by the Constitution or laws of the United States. *See United States v. Lanier*, 520 U.S. 259, 264 (1997). Because the statute incorporates all of constitutional and statutory law, it runs the risk of violating the principle that one not be punished for conduct he could not reasonably understand to be proscribed. *Id.* at 265. Thus, the coverage of § 242 is limited to "rights fairly warned of, having been 'made specific' by the time of the charged conduct." *Id.* at 267.

Nevertheless, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.* at 271 (internal quotation marks omitted). This method of analysis looks "at the officer's conduct and inquires whether that conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (internal citation, alteration and quotation marks omitted).

The foregoing principles are the same as those applied to the defense of qualified immunity in civil suits, under 42 U.S.C. § 1983, seeking damages for violations of a plaintiff's constitutional rights. *Lanier*, 520 U.S. at 270. As the Supreme Court has held in that context,

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity

9

> unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations and quotation marks omitted).

  a.    Count One

The statute itself provides that whoever, under color of law, willfully deprives any person of a right protected by the Constitution or laws of the United States, is guilty of an offense punishable by a term of years up to life imprisonment if such acts include, *inter alia*, aggravated sexual abuse. 18 U.S.C. § 242. This language provides a law enforcement officer with sufficient notice that the aggravated sexual abuse of a person whom he has arrested is a crime. Thus, he can not be described as "one of the entrapped innocent" whom the doctrine of fair notice is designed to protect. Laurence H. Tribe, *American Constitutional Law*, § 12-31, p. 1034 (2d ed. 1988).

Moreover, case law also fairly warned Morris that aggravated sexual abuse violates the victim's Fourteenth Amendment Due Process Rights. While the prior case law need not be that of the Supreme Court, *Lanier*, 520 U.S. at 268, with respect to the offense charged in count one, two Supreme Court cases are particularly apposite here. In *Brown v. Mississippi*, 297 U.S. 278 (1936), the Supreme Court held that the Due Process Clause was violated by law enforcement officers who used "extreme brutality" in order to obtain a confession. *Id*. at 281. Subsequently, in *Rochin v. California*, 342 U.S. 165 (1952), law enforcement officers witnessed a defendant swallowing narcotics and, after detaining him and taking him to hospital, administered a solution through a tube into the defendant's stomach to induce vomiting. *Id.* at 166. The Supreme Court held that such conduct violated the Due Process Clause because it "shocked the conscience," *id.* at 172, a standard

that is still viable. In light of these cases, a reasonable law enforcement officer could hardly be surprised to find himself charged with violating the Constitution for raping a person in his custody. If anything, Morris's conduct was far more shocking than the conduct in *Rochin* because of its nature and because the object was not to obtain evidence of a crime, but solely for Morris's own sexual gratification.

Moreover, consistent with *Brown* and *Rochin*, a number of circuits have held that conduct similar to Morris's also violates the Due Process Clause:

> In [a] case involving rape by a police officer after a traffic stop, the Fourth Circuit described the due process right which was violated as a "right not to be subjected by anyone acting under color of state law to the wanton infliction of physical harm." *Jones v. Wellham,* 104 F.3d 620, 628 (4th Cir. 1997). The same circuit also described this due process right as "protection against unreasonable bodily intrusions by state actors" in discussing a claim based on abusive sexual conduct in a state facility. *McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1197 (4th Cir. 1996). In a 1994 case involving sexual abuse of school children by a teacher the Fifth Circuit held that there was a well-established "liberty interest in bodily integrity," *Doe v. Taylor Ind. Sch. Dist.,* 15 F.3d 443, 450–52 (5th Cir. 1994) . . . .

*Rogers v. City of Little Rock*, 152 F.3d 790, 795–96 (8th Cir. 1998) (alterations omitted); *see Haberthur v. City of Raymore,* 119 F.3d 720, 723–24 (8th Cir. 1997) (holding that unwanted sexual fondling by a police officer violated the victim's substantive due process right to bodily integrity).

Beyond the relevant case law, it is more than obvious that the right to not be raped by a law enforcement officer lies at the core of the rights protected by the Due Process Clause, so that its unlawfulness should have been "readily apparent to the officer, notwithstanding the lack of fact-specific case law." *Fils*, 647 F.3d at 1291. Indeed, as Justice Murphy put it in a closely analogous context, "[k]nowledge of a comprehensive law library is unnecessary for officers of the law to know

11

that the right to murder individuals in the course of their duties is unrecognized in this nation."

*Screws v. United States*, 325 U.S. 91, 136–37 (1945) (Murphy, J., dissenting). The same is true of

rape.

b. Count Two

Morris was also convicted of violating § 242 by depriving NE of the right to bodily integrity

protected under the Fourth and Fourteenth Amendments. The issue is whether Morris had sufficient

notice that his threat to charge NE with child endangerment if she did not expose her breasts was a

violation of the Constitution. In *Masters v. Crouch*, 872 F.2d 1248 (6th Cir. 1989), we held that it

was clearly established that a person detained for a nonviolent minor offense could not be legally

strip searched under the Fourth Amendment absent "reasonable grounds for believing that the

particular person might be carrying or concealing weapons or other contraband." *Id.* at 1257. At

issue in *Masters* were two discrete acts: "First, Mrs. Masters was required to expose her breast area,

and later she was required to remove all her clothes and undergo [a visual inspection]. We

consider[ed] the two incidents a single search, although either would be treated as a strip search if

it occurred alone." *Id.* at 1253.

We observed that the "decisions of all the federal courts of appeals that have considered the

issue reached the same conclusion: a strip search of a person arrested for a traffic violation or other

minor offense not normally associated with violence and concerning whom there is no individualized

reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is

unreasonable." *Id.* at 1255. Moreover, we specifically held that, "[t]he single fact that Mrs. Masters,

12

for some reason, would come into contact with other prisoners was not sufficient justification for the search in this case." *Id.*

The Supreme Court has recently rejected the latter part of the holding in *Masters* and held that the reasonable suspicion requirement did not apply because of the "single fact" that a defendant would be incarcerated with other prisoners. *Florence v. Bd. of Chosen Freeholders*, 566 U.S. __, 132 S. Ct. 1510, 1513, (2012). This decision, however, does not otherwise alter the holding that clearly established law precludes a strip search without reasonable suspicion of persons arrested of a minor offense, "who are [not] to be held in jail [or other detention facilities] while their cases are being processed." *Id.* Indeed, in this case, the evidence is clear that Morris did not detain NE for any legitimate law enforcement purposes. While he may have had probable cause to arrest her, it is undisputed that Morris's detention of NE was merely a pretext to improperly use the powers of his position as a law enforcement officer to gain NE's consent to expose her breasts. *Masters* establishes that the Constitution protects against such strip searches of arrestees. Moreover, even if specific case law did not exist, Morris's "conduct lies so obviously at the very core of what the Fourth Amendment prohibits," namely unreasonable searches and seizures, "that the unlawfulness of the conduct was readily apparent to the officer." *Fils,* 647 F.3d at 1291 (internal alteration, quotation marks, and citation omitted).[1]

---

[1]Morris's conduct also appears to have violated Tennessee law, which provides that "[n]o person arrested for a traffic, regulatory or misdemeanor offense, except in cases involving weapons or a controlled substance, shall be strip searched unless there is reasonable belief that the individual is concealing a weapon, a controlled substance or other contraband." Tenn. Code Ann. § 40-7-119 (2006).

3.      *Count Three: The False Statement to the FBI*

The indictment charged that Morris made a materially false statement to the FBI when he said "that he could not recall whether he had ever had sexual contact with any woman he encountered during a traffic stop, which the defendant then well knew to be false, in violation of Title 18, United States Code, Section 1001." R. 12 at 2. The evidence at trial established that on April 18, 2007, FBI Special Agents Jeffrey Blanton and Lane Rushing interviewed Morris. They explained that they were investigating a complaint against Morris stemming from an August 24, 2005 traffic stop and gave Morris the specific allegations made by JL, including that Morris had asked for sex in exchange for not filing certain charges against her. The agents testified that they asked Morris repeatedly whether he ever had sex with anyone while on a traffic stop. The only written report of the interview, prepared by Agent Rushing, however, said that Morris "could not say that he never had sex with a woman he had encountered in a traffic stop." R. 219 at 139. This double negative clearly did not amount to a denial by Morris of ever having had "sex with a woman he had encountered in a traffic stop." Indeed, the clear implication was that he had such sex. This statement was not false. Not content to leave well enough alone, on cross examination, Morris's lawyer elicited from Agent Blanton testimony that Blanton had advised Morris that, "were talking about having sex with someone in relation to your police duties pursuant to a traffic stop, has that happened?" Blanton testified that Morris replied that "he did not recall that ever happening."

Agent Blanton's testimony came over two years after he had interviewed Morris. The substance of his testimony was not memorialized in writing, and it is materially inconsistent with

14

Rushing's carefully phrased contemporaneous written report. Agent Rushing's report recorded Morris as saying that he "could not say that he never had sex with any woman that he had encountered in a traffic stop." The statement in Rushing's report may not be a basis for prosecution under 18 U.S.C. § 1001 because it is literally true. *See Bronston v. United States*, 409 U.S. 352, 360–362 (1973) (reversing conviction for perjury where the defendant's statement was literally true but evaded the question and implied a falsehood).

Nevertheless, this does not constitute a ground for reversal here because "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *United States v. Hoffa*, 385 U.S. 293, 311 (1966). On the assumption that the jury credited Agent Blanton's testimony, it could have reasonably concluded that Morris, a law enforcement officer, would remember having sex with a woman whom he had encountered while on patrol less than two years earlier.

*4. Evidence of Other Similar Acts*

Morris argues that the district judge erred in admitting evidence of Morris's encounters with two other women as similar act evidence. We review all evidentiary rulings by the district court under an abuse of discretion standard. *United States v. Allen*, 619 F.3d 518, 523–24 (6th Cir. 2010). "Generally, an abuse of discretion is evident when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous

findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.*
(internal quotation marks omitted).

a.      *Evidence of Morris's Encounters with RL*

In February of 2003, RL was incarcerated in the Hamblen County Jail. RL had blood sugar
level problems that required her to be escorted to the kitchen for a snack during the night. In August
of 2003, Morris, who was then working at the jail, took over the duties of escorting RL for her night
snack. One night, while escorting RL, Morris made a comment about her breasts and asked RL to
show them to him. RL complied. The very next night, RL testified that Morris approached her from
behind, made another comment about her breasts, and reached down the back of her pants and put
his finger inside RL. RL asked Morris to stop, which he did, and Morris told RL not to tell anybody
because he could make things hard for her in jail. On a different night in the kitchen, Morris pulled
out his penis and asked RL to perform oral sex, which she briefly did. She testified that "we didn't
go all the way." R. 219 at 96.

RL testified that an inmate-cleaner, later identified as Bobby Bradley, came into the kitchen
just after the two had finished and later wrote a letter to RL stating that he knew what had happened.
Bradley testified that when he walked into the kitchen, he saw Morris returning his penis into his
pants and redoing his belt. Morris told Bradley that he "didn't see nothing." Once out of jail, when
he reported the details of the incident, he admitted that he initially lied to jail officials. Bradley said
he had initially lied because "I'm out on the roads, I've still got a family and Mr. Morris has got a
badge and he's got a gun; and, you know, I'm a felon, I'm not allowed to carry a gun. And I was

worried about my family." R. 219 at 51. Bradley also testified that when he got out of jail Morris visited him at his job a few times.

While Morris was not charged with any crime stemming from his encounter with RL, the district judge ruled that evidence of his conduct was admissible under Rule 413, which provides that in a case in which the defendant is accused of a sexual assault, the court may "admit evidence that the defendant committed any other sexual assault." Rule 413 goes on to provide that this evidence, "may be considered on any matter to which it is relevant." The district judge found that it was probative and not unfairly prejudicial because any jury confusion could be cured by a jury instruction. Indeed, evidence of prior sexual assaults is particularly relevant in cases such as this in which the defendant argued, albeit without testifying, that JL consented to having sexual intercourse. Specifically, in his opening statement, defense counsel told the jury that "this was nothing but a consensual sexual episode at the cemetery. As bad as that is. As bad as it is to that woman right there who is his wife, as bad as it is to his children, that's what it is, a consensual sexual episode involving a sex toy." R.217 at 28. Similarly, in his closing statement, defense counsel again argued that, "you don't see things that would suggest a forceful act. You see a consensual act. You see her getting in the back; and you hear her testify that she takes [her clothes] off, an expression of her will." R. 220 at 136.

As the Court of Appeals for the Tenth Circuit observed, "one of Congress' expressed rationales for Rule 413 [] [is] the need for corroborating evidence when the alleged rapist claims consent, and there are no witnesses other than the defendant and the alleged victim. The evidence

17

has undeniable value in bolstering the credibility of the victim." *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998). This is true even where the defense of consent is based on the argument of counsel rather than the testimony of the defendant. *See id.* Nevertheless, Morris argues that the district judge erred in not conducting a balancing of the probative value of this evidence against its danger of unfair prejudice under Rule 403. Although not explicitly required by the text of Rule 413, the cases construing the rule hold that evidence otherwise admissible under Rule 413 is subject to Rule 403, which allows the district judge to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice. *See United States v. Seymour*, 468 F.3d 378, 386 (6th Cir. 2006); *United States v. Julian*, 427 F.3d 471, 485 (7th Cir. 2005); *United States v. Medicine Horn*, 447 F.3d 620, 623 (8th Cir. 2006).

Morris's argument that the district judge failed to comply with Rule 403 is contrary to the record. The district judge heard extensive arguments on whether the probative value of this evidence was substantially outweighed by the unfair prejudice it created, and explicitly ruled that it was not. The district judge explained that while there is some risk of confusion to the jury, it could be overcome by proper instructions. Indeed, after RL testified, the district judge instructed the jury that

> You've just heard the testimony of [RL] that the defendant may have committed acts other than those charged in the indictment. If you find that the defendant did in fact commit those acts, then you may give that evidence such weight as you feel it deserves; but please remember that the defendant is on trial here only for the crimes charged in the indictment, not for these other acts. Do not return a verdict of guilty unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

*See United States v. Hollow Horn*, 523 F.3d 882, 889 (8th Cir. 2008) (upholding admission of prior

sexual assaults under Rule 413, in part, because the district judge's limiting instruction mitigated any

danger that the defendant was unfairly prejudiced). Under these circumstances, the district court did

not abuse its discretion in admitting evidence of Morris's alleged encounters with RL.

> b.       *Evidence of Morris's Traffic Stop of TW*

On the evening of September 25, 2005, sixteen year old TW stopped to get gas while driving

home. TW saw Morris in uniform inside the station speaking to the cashier. Upon leaving, TW tried

to allow Morris to pull out first because she did not like driving in front of police, but Morris did not

move. Once TW left the station, Morris followed immediately after and pulled her over a short time

later.

Morris told TW that she was pulled over for crossing the white line at a stop light and asked

TW if she had been drinking, to which she responded no. Morris asked TW to step out of her car

and asked if she had anything on her, to which she also said no. Morris put his fingers in TW's front

and back pockets and tugged on them. Morris then searched TW's car, and after finding nothing,

again asked TW if she had anything on her. TW again said no, and Morris then had TW lift out her

bra and shake it and again stuck his hands in her back pockets. Morris told TW that the ticket would

be expensive, and TW started to cry. Morris laughed and told her that he was not going to give her

a ticket. Morris then said that he liked talking to TW and invited her to a nearby state park, but TW

said that she had to get home to her mom and asked to leave. TW got home, told her mother the

story, and they immediately reported Morris's conduct to the sheriff's department. Morris was not charged with a crime stemming from this incident.

The district judge held this evidence to be admissible under Rule 404(b) as relevant on the issue of Morris's ongoing scheme or plan to commit sexual assault. The district judge found that the similarities were striking between the TW incident and the crimes for which Morris was charged and found that this evidence was not unfairly prejudicial to Morris. Moreover, the district judge repeated the same limiting instruction for this evidence as he gave with respect to the other similar act evidence regarding RL.

Morris argues that the district judge erred in admitting evidence of Morris's traffic stop of TW. The fact that evidence of other similar crimes "supports an inference that the defendant formed a plan or scheme that contemplated commission of the charged crime," 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 4:35, at 843 (3d ed. 2007), does not answer the critical question of the relevance of such a common scheme to the issues in a particular case. *See United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir. 1985) ("[T]he prior acts generally must be relevant to a matter at issue . . . ."). Indeed, in the present case, after concluding that the testimony of TW was "relevant on the issue of Morris' scheme or plan," the district judge did not explain the issue to which it was relevant, although he did suggest that the evidence could be "relevant on the issue of identity, depending on the defendant's theory of defense." R. 168 at 8.

Despite the district court's failure to identify precisely the relevance of this evidence, there is a basis for its admission. Specifically, as discussed above, Morris's "defense" to the crime

charged was that JL consented to having sexual intercourse with him and that he did not understand that what he had "done was against her will." R. 220 at 137. The relevance of consent and a defendant's mistaken belief that the victim consented is discussed in *United States v. Martin*, 528 F.3d 746, 752 (10th Cir. 2008), and *United States v. Norquay*, 987 F.2d 475, 478–79 (8th Cir. 1993), *overruled on other grounds by United States v. Thomas*, 20 F.3d 817, 823–24 (8th Cir. 1994). We agree with the Court of Appeals for the Eighth Circuit that, "the need to employ force will necessarily indicate, as a general matter, a lack of consent so obvious as to render [the defendant's mistaken belief of consent] impossible." *Norquay*, 987 F.2d at 478. So it is only in "the rare case" that this defense is available. On the assumption that this was such a case, the issue comes down to whether the TW incident was relevant to determining if Morris believed at the time that JL consented to sexual intercourse.

The district judge was correct in his conclusion that there were similarities between the TW incident and the two crimes charged in the indictment involving JL and NE. In each, Morris used his police power to pull over a vehicle and isolate a single woman, and have each woman pull her bra away from her body and shake her chest. Indeed, Morris forced JL to have sexual intercourse with him and forced NE to expose her breasts. Morris also told all three women that he would not write a ticket or could fix the problems associated with an offense in order to gain the potential victim's favor or indebtedness. Thus, the relevance of the TW incident is that, if true, it shows that Morris had formulated a plan to isolate women for the purpose of using his position as a law enforcement officer to cause them to engage in sexual conduct to which they would not otherwise

21

have consented. This evidence undermines Morris's defense that he believed that JL was voluntarily consenting to sexual intercourse with him.

Moreover, our review of the record suggests that, if error was committed, it was harmless. First, the district judge gave a clear limiting instruction, which the jury is presumed to have followed. *See Marsh v. Richardson*, 481 U.S. 200, 206 (1987). Indeed, precisely because the TW incident did not involve rape or a strip search, it was far less inflammatory and prejudicial than the crimes with which Morris was charged. The TW incident was also one of four instances of the misuse of Morris's position as a law enforcement officer. Under the circumstances, the evidence was at worst cumulative. There is no reason to believe that the verdict would have been different had evidence of this encounter been excluded.

5.      *Morris's Rule 33 Motion for a New Trial*

After Morris was convicted, JL filed an otherwise untimely civil action for damages against him. In an effort to toll the statute of limitations, she argued that she was of unsound mind until Morris was detained in 2009. Morris argues that the district judge erred in denying his motion for a new trial under Fed. R. Crim. P. 33 because the civil case undermines the prosecution's claims during closing that JL had no financial incentive to testify and only did so to seek justice. Morris argues that "having this information would 'likely have produced an acquittal if the case was retried.'"

22

We review the denial of a motion for new trial on the basis of newly discovered evidence for an abuse of discretion. *United States v. Olender*, 338 F.3d 629, 635 (6th Cir. 2003). More specifically, we have held that

> the granting or refusing of a new trial upon newly discovered impeaching evidence, including recantation by a witness, rests in the sound discretion of the trial judge and will not be granted unless the "new" evidence probably would bring about a different result. In the absence of a clear showing of abuse of discretion in determining the probable effect of the newly discovered evidence in changing the result of a trial, the action of the trial judge will not be disturbed on appeal.

*Id*. at 635 n.8 (quoting *United States v. Cordle*, 377 F.2d 522, 523 (6th Cir. 1967)). Moreover, in passing on the issue whether the evidence would probably produce an acquittal, "the court must evaluate the new evidence, not just in and of itself, but in the light of the entire record made at the trial and on the motion. The strength of the evidence presented at the trial is an important consideration. If, measured by these criteria, the court thinks that there is a reasonable probability of an acquittal . . . a new trial will be ordered. Otherwise, it will be denied." 3 Charles Alan Wright & Sarah N. Welling, Federal Practice and Procedure § 584, p. 461–64 (4th ed. 2011).

Our review of the record persuades us that Morris has failed to show that the district judge abused his discretion in concluding that the newly discovered evidence would not likely produce an acquittal. While evidence that JL filed a civil suit may have provided the basis for an inference that her testimony was motivated by a desire to recover monetary damages, that inference is significantly undermined by the fact that JL did not report the rape to the FBI until a year-and-a-half later, although she had told her friend Mowell about it the morning after. Moreover, by the time JL

23

testified she had been advised by her attorney that the statute of limitations had already run on any civil cause of action.

Separate and apart from her testimony at trial, the other evidence established that the details of the events were as she described them. Manis's testimony corroborated the details of how Morris conducted the traffic stop and searched the truck. The forensic evidence from JL's clothes corroborated her testimony that she had sexual intercourse with Morris. Perhaps equally significant was the testimony of Mowell, to whom JL detailed the rape the following morning. While the district judge did not permit Mowell to testify to the specific facts that JL related to her, he did permit Mowell to testify that, as a result of the conversation, she concluded that JL was raped. In sum, in light of the foregoing evidence, the district judge did not abuse his discretion in concluding that the probable effect of the "newly discovered evidence" would not have changed the result of the trial.

6.      *The Government's Cross-Appeal on Sentencing*

The probation officer recommended a Sentencing Guidelines range of 188–235 months. The prosecutor objected to this calculation, arguing that the sentence should be subject to a four level increase because the jury found that Morris's acts constituted aggravated sexual abuse accomplished with the use of force under U.S.S.G. § 2A3.1(b)(1). This enhancement would have yielded a Sentencing Guidelines range of 292 to 365 months. The trial judge rejected the argument because there was a legitimate concern about impermissible double counting and because the enhancement required that a type of physical force be used in the sexual abuse that was not shown in this case. The trial judge sentenced Morris to 188 months of imprisonment.

     a.        *Applicability of Section 2A3.1(b)(1) Enhancement*

The government argues that the district judge erred in refusing to grant the sentencing

enhancement under § 2A3.1(b)(1). In reviewing a calculation under the Sentencing Guidelines, we

review the district court's factual findings for clear error and review its legal conclusions *de novo*.

*United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007). The district judge held that the

enhancement under § 2A3.1(b)(1) requires a showing of force greater than that required for

conviction of aggravated sexual abuse under 18 U.S.C. § 2241(a). This determination was based on

commentary to the Sentencing Guidelines and precedent applying § 2A3.1(b)(1) to situations in

which physical force was used.

The district judge was correct that most—if not all—cases that have applied the §

2A3.1(b)(1) level increase did so based on a determination that the defendant used more physical

force than Morris did here. And the example in the Guidelines commentary, which states that this

four level increase would apply, "for example, if any dangerous weapon was used or brandished."

USSG § 2A3.1 cmt. 2 (2011), does refer to a situation in which more force was used than here. The

cases and commentary, however, do not limit the required amount of force to the specific facts

mentioned. Instead, they only require that the defendant have used force as the term is defined under

18 U.S.C. § 2241. "[T]here is no reason . . . to distinguish between the definition of force in the

context of USSG § 2A3.1(b)(1) and the definition of force in the context of § 2241." *Holly*, 488

F.3d at 1302; *see also Weekley*, 130 F.3d at 754 (the element of force is satisfied if "the sexual

contact resulted from a restraint upon the other person that was sufficient that the other person could

not escape the sexual contact."(quotation omitted)).  Our discussion of the sufficiency of the evidence shows that Morris used such force.

Because the district judge did not correctly calculate the applicable Guidelines range, the sentence must be vacated and the case remanded to the district court for resentencing pursuant to this opinion.  Nevertheless, we do not hold that the district judge may not consider the nature and degree of force used in determining a reasonable sentence under 18 U.S.C. § 3553(a) or that the sentence he imposed was substantively unreasonable.  We merely hold that he erred in the Sentencing Guidelines calculation and that a correct calculation is necessary because it is one of the factors that must be taken into account in determining his sentence under § 3553(a).  *Gall v. United States*, 552 U.S. 38, 51 (2007).

> b.      *Section  2A3.1(b)(1) Enhancement and Double Counting*

The district judge adopted probation's recommendations, which found that applying § 2A3.1(b)(1) would constitute impermissible double counting because "[t]he acts committed by the defendant were used to enhance the base offense level, and additional conduct would be required to apply the enhancement under USSG § 2A3.1(b)(1)."  Add. Presentence Rep. at 1.  "[I]mpermissible 'double counting' occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways."  *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999).  This is a legal determination that we review *de novo*.

The Sentencing Guidelines dictate that for a violation of 18 U.S.C. § 242 the base offense level should be that applicable to the underlying offense.  USSG § 2H1.1(a)(1) (2011).  The base offense level is thirty for any criminal sexual abuse under 18 U.S.C. §§ 2241 or 2242.  USSG §

2A3.1(a)(2). Aggravated sexual abuse, the underlying offense committed by Morris as found by the jury, however, is subject to a four level increase for being conduct described in 18 U.S.C. § 2241(a). USSG § 2A3.1(b)(1). Thus, it cannot be said that imposing the four level increase under USSG § 2A3.1(b)(1) is factoring "precisely the same aspect of [Morris's] conduct into his sentence in two separate ways." *Farrow*, 198 F.3d at 193. It was the sexual abuse that resulted in a level of thirty and only the aggravated nature of that offense resulted in the four level increase. Accordingly, applying USSG § 2A3.1(b)(1) would not have constituted double counting.

*7.     Remaining Arguments*

The Supreme Court has observed that, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Morris's counsel did not engage in such a winnowing process, as evidenced by the ten arguments made on appeal. While we have addressed most of them; those that have not been specifically addressed are without sufficient merit to warrant discussion. More specifically, with respect to two of those arguments, for the reasons stated in the thoughtful and reasoned opinion of the district judge, *see United States v. Morris*, No. 08-cr-90, 2009 WL 290601, at *3–4 (E.D. Tenn. Feb. 5, 2009), we hold that he did not abuse his discretion in admitting the testimony of Dr. Catherine Zook-Bell, a psychologist who performed an evaluation of JL, and denying Morris's application for an independent psychological evaluation of JL.

**CONCLUSION**

The judgment of conviction is affirmed. The sentence is vacated and the case is remanded to the district court solely for the purpose of resentencing.